FREDERICK H. CONE & CO., INC. *v.* UNITED STATES

No. 4415.—Invoices dated Kobe, Japan, June 7, 1935, etc.
Entered at Toledo, Ohio, July 10, 1935, etc.
Entry No. 3, etc.

Second Division, Appellate Term

(Decided October 18, 1938)

*Brooks & Brooks* (*Frederick W. Brooks, Jr.,* of counsel) for the appellant.
*Webster J. Oliver,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the appellee.

Before TILSON, KINCHELOE, and DALLINGER, Judges

TILSON, Judge: This application for review involves the proper dutiable value of certain wood brush blocks imported from Japan. The merchandise was purchased, invoiced, and entered at an average price for the first stripe, second stripe, and black blocks, and was

appraised at a separate value for the first stripe, second stripe, and black blocks. The only question before the trial court, and this court on appeal, is whether or not this was a proper method for appraisement purposes.

Section 500 (a) (1) of the Tariff Act of 1930 provides in part as follows:

It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe—

*To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold.* [Italics ours.]

The trial court, in disposing of this case the second time, stated in part as follows:

As already pointed out, the evidence offered on the trial after remand shows that both methods of purchase were usual. I am therefore of the opinion that the appraisement made by the appraiser was not void for the reason given above. It is true that it has been shown that the basis of appraisement, i. e., the export value, was erroneous, but it is my view that the plaintiff having failed in two attempts to produce evidence upon which I might find one of the values set forth in section 402, supra, I have no other course than to dismiss the appeals.

The question of whether or not the basis of appraisement, i. e., export value, was correct or erroneous, is not before us. The record shows that the appraiser adopted the export value as the proper basis of appraisement. Section 501 of the Tariff Act of 1930 provides in part as follows:

The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

The appellee offered no evidence which in any way disproves the appraiser's action in adopting the export value as the proper basis of appraisement, and the evidence offered by the appellant tends to confirm and establish the correctness of such basis of appraisement. We, therefore, find from the weight of the evidence, including the presumption of correctness attaching to the action of the appraiser in adopting the export value as the proper basis of appraisement, that the proper basis of appraisement of this merchandise was the export value, as that term is defined in section 402 (d) of the Tariff Act of 1930.

The witnesses stated at the trial that they had at times purchased these black blocks in the different style numbers or pattern separately from and without purchasing the stripes, either first or second, and that they had also at times purchased the stripes without purchasing the black blocks. All of the witnesses were in agreement however that this was not the *usual* way of buying and selling these blocks. The weight of the evidence conclusively establishes that this merchandise is usually bought and sold by the dozen, taking so many of

the first stripe, so many of the second stripe, and so many of the
black blocks in each separate style number or pattern at an average
price for the three, and that it is not usual in dealing in this mer-
chandise, i. e., buying and selling, to buy and sell the first stripe
alone, the second stripe alone, or the black blocks alone in any of
the different style numbers or patterns. As explained by one witness,
if his firm were buying a thousand dozen military brushes, the general
customs in Japan has been approximately 70 per centum, which in-
cludes the first and second stripes in each different style number or
pattern, and 30 per centum black blocks in each different style number
or pattern, but these percentages are never definite or constant.

In Exhibits 5 and 6 affiants state;

Deponent further states that sometimes when raw material is plentiful striped
blocks and black blocks can be bought separately at separately specified prices
but that at all times it was and is customary to buy assortments at average
prices.

Exhibit 4 shows that the prices shown on these invoices were the
prices at which the various manufacturers freely offered the said
blocks for exportation to the United States, and that the quantities
shown on said invoices were the usual wholesale quantities.

In Exhibits 5 and 6, with reference to the usual method of buying
and selling these blocks, affiant states:

* * * that he obtains from an ordinary log of ebony wood usually ⅓ first
stripe, ⅓ second stripe, and ⅓ no stripe, or wood of so inferior pattern that the
piece has to be dyed black. Deponent further states that it was quite customary
in the year 1935, and still is, to buy ebony brush blocks at an average price for
assorted first stripes, second stripes and blacks.

Exhibit 14 is a special agent's report admitted in evidence upon
motion of counsel for the appellee. On page two thereof is detailed
a sale of 600 doz. natural ebony, 60 per centum first stripe, 40 per
centum 2nd stripe and 400 doz. black ebony at an *average* price for the
entire lot of 1.58 yen per dozen. On page 3 of said report it is stated:

Questioned as to the makeup of the quality prices from which the average price
was computed, Mr. Friedlander stated that the orders issued by Sims for percent-
ages or quantities of first and second striped and black dyed blocks were not
followed by the manufacturer to the letter. When orders are issued by Sims,
the concern does not know until it receives the blocks and the invoices just
how many of each quality blocks will be produced by the maker against the order.

Mr. Friedlander stated that the makers purchase seasoned ebony, or ebony
purported to be seasoned, from which they produce the blocks according to
blue print, specifications or sample. First striped quality consists of blocks with
narrow regular stripes, which stripes are not deeply colored or of a greenish tinge.
A greenish tinge indicates wood which has not been fully or properly seasoned.
Second quality consists of blocks with wide stripes or wide or narrow stripes,
irregular in contour or appearance.

If from the raw material neither of the above qualities can be produced or if,
in production, the blocks do not conform to either of the qualities in question,

the blocks are dyed black in order to hide the stripe defects. From a given piece of ebony, a maker endeavors to produce the greatest amount of first and second striped quality blocks possible. Until the wood is out it is not possible for a block maker to estimate the percentage of the various quality blocks that he can produce from the wood in question.

On page 4 of said report, referring to an inspection of the records of S. Hashimoto Shoten, the special agent states:

The sales records of the company relative to the sales in question to J. Grover Sims were inspected and found to be in agreement with the data previously ascertained at the office of the shipper, as to prices paid, ordered and invoiced quantities, qualities, etc.

The *average* prices paid were in agreement with Sims orders.

Mr. Hashimoto confirmed the explanation given by Mr. Friedlander regarding production of blocks and *average* prices.

Referring to an inspection of the record of K. Idzumi Shoten, the special agent, on page 6 of said report, states:

The sales records of the concern relative to the sales to J. Grover Sims were inspected and found to be in agreement with the data previously ascertained at the office of the shipper, as to prices paid, ordered and invoiced quantities, qualities, etc. The *average* prices paid were in agreement with Sims orders.

On page 7 of said report we find the following:

Mr. Idzumi confirmed the explanation given by Messrs. Friedlander and Hashimoto regarding production of blocks and *average* prices.

On page 10 of said report, reporting upon an inspection of the records in the office of Fujimoto, the special agent states:

The sales records of the company, such as they were, were inspected and found to be in agreement with the data as to prices, numbers, etc., previously ascertained at the office of the shipper.

On page 11 of said report, with reference to an inspection of the records of one Yonezawa Shoten, the special agent reports as follows:

The sales records of the company were inspected and found to be in agreement with the data previously ascertained at the office of the shipper, as to prices, quantities, etc.

On page 12 of said report, after detailing a number of sales of ebony and natural ebony blocks, at an *average* price, the report states:

It will be noted that the above sales are for *average* piece.

On the weight of the evidence as above set out, and from an examination of the entire record before us, we find that the merchandise in question is usually bought and sold at an average price for the first stripe, the second stripe, and for the black blocks. Therefore, the contrary finding of the trial court in this respect is against the weight of the evidence, and is accordingly reversed.

For the reasons hereinbefore stated and upon the weight of the evidence we find that the brush blocks in this case are usually bought

and sold at an average price for the first stripe, second stripe, and the black blocks, and that the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, is the invoiced and entered value, based on an average price for the first stripe, second stripe, and black blocks.

The decision of the trial court is accordingly reversed. Judgment will be rendered accordingly.