STERN & HERFF CORP. *v.* UNITED STATES

**No. 7500.**—Invoice dated Oloron, France, February 16, 1938.
Certified February 23, 1938.
Entered at New York, N. Y., March 8, 1938.
Entry No. 825530.

(Decided January 8, 1948)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

COLE, Judge: A quantity of white wool berets in two sizes (9 and 9½), exported from France, was entered at the port of New York, at the importer's purchase price of 35 francs per dozen, plus packing at 40 centimes per dozen, which plaintiff contends is the proper dutiable export value under section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)).

Appraisement was made on the basis of foreign value, section 402 (c) of the Tariff Act of 1930 (19 U. S. C. 1934 ed. § 1402 (c)), at 42.75 francs per dozen, packed, for size 9, and 45.60 francs per dozen, packed, for size 9½, both prices less 3 per centum and 2 per centum.

The appraiser also made a finding under the Antidumping Act of 1921 (19 U. S. C. § 160). In taking such action, he followed the order of the Secretary of the Treasury, stating: "After due investigation, in accordance with the provisions of section 201 of the Antidumping Act, 1921, I find that the industry manufacturing wool knitted berets in the United States is being and is likely to be injured by reason of the importation into the United States of wool knitted berets from France, and that such wool knitted berets from France are being sold and are likely to be sold in the United States at less than their fair value" (75 Treas. Dec. 199, T. D. 50034).

The appraiser's report under said Antidumping Act shows a computed purchase price (section 203 of said act) of 38.20 francs per dozen, net, packed, for both of the items in question; that the unit foreign market value on the date of purchase and on the date of exportation (section 205 of the Antidumping Act) for size 9 was 40.6382 francs per dozen, net, packed; and that such unit foreign market value for size 9½ was 43.3474 francs per dozen, net, packed.

The primary issue before me in this appeal for reappraisement is whether export value, as claimed by plaintiff, or foreign value, as found by the appraiser, should prevail.

Two witnesses, one, the treasurer of the importing corporation, and the other, an importer of French berets with approximately 20 years' experience in the business, testified for the plaintiff. Their testimony is cumulative to the effect that the principal market in France for berets, like or similar to those in question, is Oloron, the place of manufacture of the instant merchandise, which at the time of exportation, along with similar berets, was purchased from foreign exporters on an irrevocable letter of credit (equivalent to cash basis) at one price, regardless of sizes and colors, in orders ranging in quantities from 1,500 dozen to 5,000 dozen, at a time.

Plaintiff also introduced an affidavit (exhibit 2) executed by one Pierre Laulhere, associated for the past 20 years with the French manufacturer of the merchandise under consideration. He stated he is "personally familiar with the sales in France for home consumption and for exportation to the United States of such berets and all of the customs of the trade relating thereto." His statement deals largely with differences in transactions involving berets, including those under discussion, when sold for export to the United States and when sold for consumption in the foreign market, and shows that berets are sold for export to the United States on a cash basis at a uniform

price for all sizes and colors, orders therefor varying from 1,500 dozen to 10,000 dozen, most of them being for quantities in excess of 3,000 dozen. Purchases thereof by American customers or importers are usually made in "our dull period," and "when we can manufacture to our great advantage in cost and in keeping our plant and labor busy." Sales in the French market for home consumption are on a credit basis at different prices for the various sizes, the whites being sold at a higher price than colors. Prices for foreign market merchandise include different taxes, as well as various items of selling expenses, that do not attach on sales for export to the United States. Cost of packing is included in the selling price of merchandise intended for home consumption, whereas the item is added as an extra charge on sales for export to the United States. Because the French pouce (or inch) equals 1.06 American inches, there is a size differential between the berets sold for the French market and those sold for export to this country. For example, the French size 9 uses approximately the same quantity of wool as the American size 9½, and this variance remains the same in all sizes. The largest percentage of berets exported to the United States is size 7½, the smallest size. The witness concluded his testimony with an admission to the effect that it is difficult to compare the prices for home consumption with export prices because of the differences in the two classes of transactions, but that his sales to both markets are equally profitable.

Defendant's evidence consists of two special agent's reports. One (exhibit 4) is dated December 6, 1937, and mentions seven consular invoices, none of which is before me. The report refers to a period, prior to the exportation of the berets in question, and when the selling price for the export market was higher than the price paid by plaintiff. The sales records, enumerated in the report, showing merchandise sold for home consumption, relate to transactions consummated several months prior to the date of exportation of the present merchandise. I attach little weight to this document.

Defendant's other report, exhibit 3, referring specifically to the consular invoice covering the shipment in question as well as to other invoices, contains much that is corroborative of plaintiff's proof, with reference to the distinguishable conditions affecting the two markets, i. e., export and foreign. Neither the representative sales nor the price lists set forth therein show prices identical with those found by the appraiser for the berets in question. The report tends very strongly, however, to show that prices for the instant merchandise, when sold for consumption in the French market, were higher than the uniform price at which it was sold for export to the United States.

The record is convincing that at the time of exportation of the berets in question, there existed for such or similar merchandise, a foreign value and an export value, section 402 (c) and (d), *supra*.

Under such circumstances, the higher shall prevail, section 402 (a) of the Tariff Act of 1930.

That the importer's purchase price, the entered value, is the statutory export value for the instant merchandise, is fully established by the proof. Plaintiff, however, has the additional burden of showing that the foreign value was no higher, and it is on this phase of the case that the evidence falls short.

Counsel for plaintiff, in their brief, argue that "the foreign value can only be estimated or approximated by computing prices for different sizes, weights, colors and by making allowances for discounts, packing and other costs," citing, in connection with such statement, *Frederick H. Cone & Co.* v. *United States* (1 Cust. Ct. 664, Reap. Dec. 4415), and *Gulbenkian & Co.* v. *United States*, (153 Fed. Rep. 858). In each of the cited cases, the court found that the usual method of buying and selling the particular merchandise under consideration was at an average price, and accordingly held the average price to be the proper dutiable value. The same condition does not apply to the articles under consideration. There was, at the time of exportation of the berets in question, a definite foreign market value therefor. It is true that different prices prevailed for both sizes, but each size had its fixed price at which it was freely offered in the principal market.

Section 202 (b) of the Antidumping Act of 1921, *supra*, provides in effect that if the appraiser is satisfied that the difference between the purchase price and foreign market value is "wholly or partly due to the fact" that the wholesale quantities are greater when such or similar merchandise is sold for export to the United States than when sold for home consumption in the principal market of the country of exportation, "then due allowance shall be made therefor in determining the foreign market value for the purposes of this section."

Employing such statutory language as a premise, plaintiff alleges that the foreign market value of the instant merchandise will be lower than the importer's purchase price "if due allowance is made for the difference in quantities sold for export to the United States and for home consumption." To support this contention, plaintiff refers to the testimony of the foreign manufacturer and exporter (exhibit 2), stating that "our sales for exportation to the United States were at least as profitable to us as our sales for home consumption in France, particularly because of the larger quantities covered by our sales for exportation to the United States and also because of the substantial amount of size 7½ included in all of our sales to Stern & Herff during 1938 and 1939."

The inference to be drawn from the above quotation from witness' testimony is that because the foreign manufacturer conducted its business in such a manner as to realize an equal margin of profit on

sales for home consumption as well as on sales for export to the United States, it therefore follows that the foreign and export values, for tariff purposes, are the same. To accept such reasoning in determining the issues herein, would violate the clear requirements of the statute, section 402 (c) and (d), *supra*.

Plaintiff has failed to show that its purchase price, the statutory export value, for the present merchandise, was equal to or higher than the foreign market value, as defined in section 402 (c), *supra*.

The record before me does not establish for the berets in question any values different from those found by the appraiser, both under the Tariff Act of 1930 and the Antidumping Act of 1921, which I hold to be the proper values for tariff purposes. Judgment will be rendered accordingly.